

John Zuccarini
190 SW Kanner Highway
Stuart, Florida 34997
(772) 631-3887

Pro Se Defendant

# UNITED STATES DISTRICT COURT

## NOTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| OFFICE DEPOT INC., a Delaware<br>Corporation<br><br>                    Plaintiff,<br><br>vs.<br><br>JOHN ZUCCARINI, individually and<br>d.b.a. COUNTRY WALK; and DOES 1<br>through 10, inclusive,<br><br>                  Defendants. | Case No. C-06-80356-SI<br><br>RULE 60 (b)<br>RELIEF FROM JUDGMENT |
| DS HOLDINGS, LLC a Colorado limited<br>liability company,<br><br>                  Assignee,<br><br>vs.<br><br>JOHN ZUCCARINI, individually and<br>d.b.a. COUNTRY WALK; and DOES 1<br>through 10, inclusive,<br><br>                  Defendants. | DATE:    July 16, 2010<br>TIME:    9:00 A.M<br>PLACE:  Courtroom 10, 19th Floor<br>The Honorable Susan Illston |

## BRIEF IN SUPPORT OF DEFENDANT'S
## RULE 60(b) MOTION FOR RELIEF FROM JUDGMENT

COMES NOW, Defendant John Zuccarini who files *Brief in Support of Defendant's Rule 60(b) Motion For Relief From Judgment* .

The Federal Rules of Civil Procedure Rule 60(b)(1),(3),(4) and (6) allow relief from Judgment in the following circumstances:

**Rule 60.  Relief from Judgment or Order**

(1) mistake, inadvertence, surprise, or excusable neglect;

(3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;

(4) the judgment is void;

(6) any other reason justifying relief from the operation of judgment.

## BRIEF PROCEDURAL BACKGROUND

In December 2000, Office Depot, Inc. obtained a Judgment against Defendant; Office Depot assigned the Judgment to DS Holdings (DSH). After learning that the Defendant owned more than 248 domain names registered with VeriSign, Inc., DSH moved to levy on 190 of the domain names; specifically the ones that were ".com" domain names.

September 7, 2007, DSH moved for appointment of a post-judgment receiver to aid in enforcing the Judgment by obtaining and selling the domains; this Court Granted the Motion on September 10, 2007.

Defendant Appealed from the Court's appointment of a receiver; which the 9th Circuit Affirmed February 26, 2010. Defendant moved to Stay the Mandate pending Petition for Certiorari, to which DSH Objected stating that Defendant had failed to "provide the Court with any background facts, case law, or record citations that would support the issuance of a stay."

2

DSH goes on to state "Zuccarini makes no argument whatsoever to overcome the rigorous standard for obtaining a stay." [Doc.93,pg.3].

DSH assures the Court that there is "no chance that the Supreme Court will consider the underlying issue here", and brings up the fact that there are issues of "California state law" involved; while alleging that there are no "constitutional concerns, fundamental rights, comity among the States" DSH goes on to assure this Court that "the Supreme Court grants Certiorari in somewhere around *one* to *two percent* of the cases submitted" in any one term. [Doc.93,pg.4]

DSH agrees that the case involves questions about domain names as property, but they discard the notion because "neither this Court nor the Ninth Circuit expressed any concern". DSH then goes on attempting to show that not staying the mandate would not "effect fundamental rights", and would not "effect a significant number of people", they then attempt to make it appear that the Judgment is a "straightforward, common procedure, affecting only the two parties". [Doc.93,pg.4].

On May 15, 2007, the court denied the Plaintiff's motion for a Turnover Order. [Doc.17] Order Denying Ex-Parte Application for Turnover Order. On September 7, 2010 however, the Court granted the appointment of a receiver. [Doc.30] Order Granting Application for Appointment of receiver.

In doing so the Court decided that to bypass California state law, the appointment of receiver would be necessary. Thereby avoiding the third party issue, as in the Court's view, it would no longer exist. In reality, it only changed the issue of who the third party was.

Further, the receiver, Michael Blacksburg appointed by this Court has through oversight or through not being aware of his responsibilities, allowed the yearly registrations of thirteen

3

(13) domain names to expire, causing the receiver to loose ownership of the domain names. The result of which caused the domain names to, through the automated protocol of the domain name registrar, Network Solutions Inc., (NSI) to be placed in auction during the month May 2010. Consequently all thirteen (13) domain names are now in the ownership of entities other than the receiver.

In addition, of the approximately between $65,000 and $70,000 obtained through the auctions. The former owner, the receiver, is now entitled to only 20 percent of the auctioned amount. Even that 20 percent though is not guaranteed, as it is contingent on the receiver correctly following protocol as required by the domain name registrar. NSI is the only domain name registrar that offers a 20 percent return to former domain name owners, so it is just by luck that the domain names are registered with NSI, that even this amount could possibly be recovered.

An article on the internet "After 7 Hours of Bidding, GovermentGrants.com Sells For $53K On NameJet (Yes It's a Typo)"[1] *"Exhibit A"* shows that one domain name, govermentgrants.com sold at auction for Fifty-three thousand dollars ($53,000.00). In fact, the article shows that on that one day, Domain Names taken from the Defendant sold for Sixty-five Thousand Dollars ($65,000.00).

Had the receiver been properly managing what he had been entrusted by this Court, a large portion of the debt that Defendant's Domain names were taken to satisfy, would have been eliminated.

---

[1] "After 7 Hours of Bidding, GovermentGrants.com Sells For $53K On NameJet (Yes It's a Typo)" http://www.thedomains.com/2010/05/25/after-5-hours-govermentgrants-com-sells-for-53k-on-namejet-yes-its-a-typo/

4

While Mr. Blacksburg has written letters to the new owners of the domain names and to NSI in hopes of the having the domain names returned to his ownership, the outcome of this attempt is questionable, and could result in multiple legal actions involving the parties of this case. For example if NSI reversed the change of ownership, or refused to complete the change of ownership of any of the domain names lost to auction, they could open themselves, and the receiver himself to multiple legal actions by parties who in good faith purchased the domain names at auction.

If the receiver, Mr. Blacksburg were to become involved in any such legal actions he would most likely charge the expenses of those actions against the revenues from the domain names that have accumulated over the last two years, which of course would have the obvious effect of further depleting the funds available to the parties who have amounts owed them.

## ARGUMENT AND CITATION TO AUTHORITY

Defendant's Motion is timely. F.R.C.P. Rule 60(b)(1),(3), and (4) require that the Motion be filed within a year of the Final Ruling; Defendant's Motion is thereby timely. Rule 60(b)(6) has no set timeline.

### I.    The Due Process Clause

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decisionmaking process". See *Carey v. Piphus*, 435 U.S. 247, 259-262, 266-267 (1978).

5

This Court previously held :

> "The court is concerned, however, with DS Holdings' ultimate plan to auction off the domain names at issue. As Zuccarini points out, many of the domain names at issue are deliberate misspellings and variations of legitimate domain names, both generic and proprietary. Such names may have legitimate purposes, as counsel argued at the hearing, but they may also be used to misdirect consumers, as apparently Zuccarini himself did."

The District Court, while correctly addressing this issue in their order of September 10, 2010, the Courts decision to allow jurisdiction and the creation of the receivership did not reflect a complete appreciation of the issue concerning the inherent nature of the subject domain names as misspellings and variations of other domain names in their creation and use.

The Court mistakenly assumes the DS Holdings ("DSH") argument that the domain names may have legitimate purpose is correct. The DSH argument is incorrect, because of the inherent nature of the domain names as misspellings and variations of other domain names, there can be no legitimate use. The domain names can do only one thing, that is to redirect Internet consumers through Internet navigational protocol away from their intended destinations.

Further, for the Plaintiff to claim that the very domain names that are being auctioned off will be bought by someone in good faith, and will not be used for cybersquatting simply is not logical. In essence, by this Court allowing the domain names to be auctioned off, the Court is promoting cybersquatting, which the Federal Trade Commission has deemed as illegal, and the Defendant was prosecuted for.

In other words, if the Defendant uses the domain name, it is cybersquatting, but the person that is the highest bidder of that same domain name will not be cybersquatting. That reasoning cannot be construed as "neutral", or impartial.

On December 21, 2006 the Federal Trade Commission (FTC) filed in the Eastern District

6

of Pennsylvania a *Memorandum of Points and Authorities in Support of Plaintiff's Ex Parte Motion for Defendant Zuccarini to Show Cause Why He Should Not be Held In Civil Contempt*, (2:01-CV-04854-BMS). The FTC stated on page 8 of the document.

> "Zuccarini's current business activities, which he manages from his residence in Stuart, Florida, once again involve using numerous misleading domain names to redirect consumers from their intended destinations"...
> "... Zuccarini owns and operates domain names that are variations of a wide range of popular domain names, including those targeting consumers seeking online information about video games, translation services, government grants...

This statement by the FTC refers to the corresponding list of eighty (80) domain names that the FTC provided to the District Court in Philadelphia, as misspellings or variations of other domain names, which the Defendant included in the brief to this District Court for the hearing of September 7, 2007.

On September 25, 2001 the FTC filed in the Eastern District of Pennsylvania, *Memorandum of Points and Authorities in Support of Plaintiff's Ex Parte Motion for Temporary Restraining Order and Other Equitable Relief.* An essential part of the case involved the use of misspellings and variations of domain names the Defendant, John Zuccarini registered to redirect Internet consumers away from their intended destinations. In referring to the practice of redirecting consumers, the FTC stated on page 18 of document.

> "Section 5 of the FTC Act states, in relevant part: "Unfair or deceptive act or practices in or affecting commerce, are declared unlawful." 15 U.S.C § 45. In the present case, Defendant has engaged in both deceptive and unfair business practices in violation of Section 5."

The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. See *Mathews v. Eldridge,* 424 U.S. 319, 344 (1976). At the same time, it preserves both the appearance and

7

reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.

## II.    California State Law

The California Court of Appeals, has in fact actually held that you cannot levy upon domain names. The door was not left open as the 9th Circuit claims, the door was closed when The California Court of Appeals held that domain names are intangible, they cannot be taken into custody.

> *Intangible property.* Property that lacks a physical existence - Examples include bank account, stock options, and business goodwill. Cf. *tangible property.*[2]

Domain names are "intangible property under California law". *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003). In *Palacio Del Mar Homeowners Ass'n, Inc. v. McMahon*, 174 Cal. App. 4th 1386, 1391 (2009), a California Court of Appeals held that domain names do not constitute property subject to a turnover order because they cannot be taken into custody.

Further, even had the California Appellate Courts not so held, the Federal Courts would have been obligated to Certify the question to California's Supreme Court. "Effective Jan. 1, 1998, California Rule of Court 29.5 created a process whereby sister state courts of last resort and federal appellate courts could certify unresolved questions of California law to the California Supreme Court."[3]

---

[2] Black's Law Dictionary, 7th Ed. page 1233.

[3] Originally published in the June 7, 2000 issue of the Los Angeles Daily Journal.

8

Further, there is no difference between the assignee and a receiver when it comes to the Court ordering a turnover. If the property, under California law is intangible thereby not subject to a turnover order, it makes no difference whether there is an assignee or a receiver involved.

In *Fisher v. Amaraneni,* 565 So. 2d 84 (Ala. 1990), the court defined a judgment as void if the court "acted in a manner inconsistent with due process." *Id.* at 86 (citing *Wonder v. Southbound Records, Inc.*, 364 So. 2d 1173 (Ala. 1978)). It should be noted here that a Rule 60(b)(4) motion involves a different standard of review than the other Rule 60(b) subsections since the court held "[w]hen the grant or denial turns on the validity of the judgment, discretion has no place for operation. If the judgment is void it must be set aside ...." *Fisher,* 565 So. 2d at 87.

> "A court should be cautious in exerting its inherent power and 'must comply with the mandates of due process" *First Bank of Marietta v. Hartford Underwriters Insurance Company,* 2002 U.S. App. LEXIS 21117, -25; 2002 FED App. 0356P (6th Cir. 2002); *In Re Atlantic Pipe Corp.*, 304 F.3d 136, 143 (1st Cir. 2002)

A denial of due process is for the most part treated like any other legal error, and is thus waived if not pressed. Want of subject-matter jurisdiction is not waivable--until the loser has exhausted his appellate remedies, after which courts will not treat the judgment as void unless the jurisdictional error is egregious, as in *In re Taylor*, 884 F.2d 478, 480-82 (9th Cir. 1989).

Although Plaintiff claims that alleging that there are no "constitutional concerns, fundamental rights, comity among the States" [Doc.93,pg.4], they are wrong and this Court is well aware of the fact that Federal Courts are not to interpret the state constitutions, alter the state's laws, etc.

The fact that California law states one thing, then this Court while relying on the state

9

law, rules contrary to that what that same law states, according to The United States Supreme Court, results in "a federal court's interference with this process constitutes undue interference with a state's legitimate activities." *Juidice v. Vail*, 430 U.S. 327, 335-36, 97 S.Ct. 1211, 1217-18, 51 L.Ed.2d 376 (1977).

The United States Supreme Court held in *Younger v. Harris*, 401 U.S. at 53-54 is required by "[o]ur Federalism['s]" notion of comity, that is, "a proper respect for state functions" and "the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." Because of this Court's erroneous Ruling in this matter, and the affirmance by the 9th Circuit Court of Appeals, the California laws stating that

The U.S. Supreme Court has also held: "We recognize that, as a general proposition, 'state courts shall remain free from interference by federal courts.'" Atlantic Coast Line R.R. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 282, 90 S.Ct. 1739, 1741, 26 L.Ed.2d 234 (1970).

This Court's logic and ruling, and the 9th Circuit's logic and ruling will be used in California to twist California law. In the 9th Circuit's Ruling on February 26, 2010 page 9, they stated:

> "First, we have already held that **domain names are intangible property under California law**. *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003). *In Palacio Del Mar Homeowners Ass'n, Inc. v. McMahon*, 174 Cal. App. 4th 1386, 1391 (2009), a California Court of Appeal held that domain names do not constitute property subject to a turnover order because they cannot be taken into custody.

On the next page, but still within the same paragraph, the 9th Circuit Appellate Court then went on to say:

10

> "However, the court left open the question whether domain names constitute intangible property generally, and it cited **Kremen** with approval."

Apparently, the comparison between "domain names are intangible property under California law" and whether "domain names constitute intangible property generally" under California law. The law clearly stated that intangible property cannot be taken into custody and if you can't take the property into custody, it can't be levied up in order to execute a writ against it; is much like the comparison between the defendant owning and using certain domains names is a criminal act because of the likeness of that domain name to a business's name, but is not a criminal act for the winning bidder for that same domain name to pay $53,000.00 and use that domain name.

The results of these Court's decisions can and will cause "interference by the federal courts". Some attorney will come along and use this decision in a California Court to his advantage because the federal court ruled against the California law. The **U.S. Supreme Court** held: "We recognize that, as a general proposition, 'state courts shall remain free from interference by federal courts.'" *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 282, 90 S.Ct. 1739, 1741, 26 L.Ed.2d 234 (1970).

### III.   <u>Extreme or Undue Hardship</u>

Among the many other reasons shown why Defendant should be granted Relief From Judgment, the Judgment can and will work an extreme and/or undue hardship. Defendant, having been found guilty of cybersquatting for the use of the very domain names that this Court allows to be auctioned to the highest bidder, will suffer from extreme and/or undue hardship from the ruling.

11

Office Depot appointed an Assignee, this Court appointed a receiver. The receiver has not properly managed that for which he was appointed. Defendant has shown that while Mr. Blacksburg was out of town for an extended length of time, Domain Names taken from the Defendant to secure a debt to Office Depot, were "dropped", and sold at auction for Sixty-Five Thousand Dollars ($65,000.00). One of the Domain Names alone, was "the highest domain sale on my NameJet.com board since the mid-February auction of Historia.com (sold for $40K)."

Due to the Domain Names not being properly managed by Mr. Blacksburg, eighty (80) percent, or even possibly one hundred (100) percent of the amount acquired by the auctions will go elsewhere instead of toward the debt that the Domain Names were taken to satisfy. A very large portion of the debt could have been eliminated with the sale that took place on that one day which was in the neighborhood of Sixty-Five Thousand Dollars ($65,000.00).

Needless to say the Rulings by this Court have caused an extreme and undue hardship upon the Defendant. The only way to prevent further extreme and undue hardship is for this Court to Grant Defendant's Motion for Relief from Judgment.

"Rule 60(b) is `properly invoked where …the judgment may work an extreme or undue hardship'. ..." *Preserve Endangered Areas of Cobb's History ("PEACH") v. United States Army Corps of Engineers*, 916 F.Supp. 1557, 1560 (N.D.Ga.1995) (quoting *Mohammed v. Sullivan*, 866 F.2d 258, 260 (8th Cir.1989) (internal quotes omitted)), aff'd, 87 F.3d 1242 (11th Cir.1996).

## **CONCLUSION**

Defendant has made meritorious showing that a ruling in his favor would be fair and just;

the Defendant Moves this Court to Grant his Motion for Relief from Judgment.

Respectfully submitted this 1st day of June, 2010

By: _John Zuccarini_
John Zuccarini

Pro Se Defendant

## EXHIBIT A

http://www.thedomains.com/2010/05/25/after-5-hours-govermentgrants-com-sells-for-53k-on-namejet-yes-its-a-typo/

After 7 Hours of Bidding, GovermentGrants.com Sells For $53K On NameJet
(Yes It's a Typo)
2010 May 25

by MHBAfter

7 hours of extended bidding on NameJet.com, the auction for the domain name GovermentGrants.com finally ended with a sales price of $53,022.

Yes its a typo.

The correctly spelled domain, governmentgrants.com has some nice traffic, with compete.com showing over 30K monthly visitors and Alexa gives it a rank of 555K.

The ownership of GovernmentGrants.com is under Moniker privacy.

The typo that sold today has an Alexa rank of 5.5M.

According to WordTracker.com there is about 10% of the search volume for the typo as for the correct term.

So if GovermentGrants.com sold for $53K is GovernmentGrants.com worth in excess of $500K?

Yes its kind of unfortunate to see the highest selling domain on my NameJet.com board for 2010 to be a typo.

Its also the highest domain sale on my NameJet.com board since the mid-February auction of Historia.com (sold for $40K).

A few other "Government" typo domains sold today:

USGoverment.com $4,950

GovermentGrant.com $3,950

GovermentAuction.com $2,750

GovermentAuctions.com $2,500

14

The correctly spelled domains of FloridaGovernment.com and CaliforniaGovernment.com also sold today for only around $2K each.

Since all of these domains appeared to drop on the same day, it looks like one domain holder just let $65K in domains just drop.

Ouch.

In a non-government domain sale today, ComputerUpgrade.com went for just $3,773 on NameJet

15